UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MEXICALI CHICKEN & SALADS, DOES 1 through 10, Inclusive,<br><br>Defendant. | Case No.: 15-CV-2164-AJB-JMA<br><br>**ORDER GRANTING THE EEOC'S MOTION FOR DEFAULT JUDGMENT**<br><br>(Doc. No. 9) |

Presently before the Court is Plaintiff U.S. Equal Employment Opportunity Commission's ("EEOC") motion for default judgment. (Doc. No. 9.) Defendant Mexicali Chicken & Salads ("Mexicali Chicken") has failed to oppose the motion, notwithstanding passage of its October 17, 2016, deadline. Having reviewed the EEOC's moving papers and evidence in light of controlling legal authority, and pursuant to Local Civil Rule 7.1.d.1, the Court finds the matter suitable for decision without oral argument. For the reasons set forth below, the Court **GRANTS** the EEOC's motion.

## BACKGROUND

The EEOC brings this lawsuit on behalf of Alexis Lopez ("Lopez"), asserting claims of quid pro quo sexual harassment and retaliation. Lopez was an employee of Mexicali

Chicken in 2012, a Mexican restaurant in Imperial County, El Centro, California. (Doc. No. 1 ¶¶ 16–17.) At the time of the incident, Lopez was a shift supervisor. (*Id.* ¶ 17; Doc. No. 9-2 ¶ 4.) Two of her immediate supervisors were Michael Salcedo ("Salcedo") and his common law wife, Mary Silvestre ("Silvestre"). (Doc. No. 9-2 ¶¶ 5–6.)

As one of Mexicali Chicken's managers, Salcedo controlled the details of day-to-day work, designated work assignments, interviewed applicants, and fired employees. (Doc. No. 1 ¶ 19; Doc. No. 9-2 ¶ 7.) When not on Mexicali Chicken premises, Salcedo would occasionally call the shift supervisor with instructions. (Doc. No. 9-2 ¶ 9.) Salcedo had the authority to hire, fire, and make decisions on behalf of Mexicali Chicken. (Doc. No. 1 ¶ 19; Doc. No. 9-2 ¶ 7.) Salcedo was the person who interviewed, hired, and terminated Lopez. (Doc. No. 9-2 ¶¶ 8, 25, 28.)

On or around June 26, 2012, Salcedo called Lopez while she was at work. (Doc. No. 9-2 ¶ 11.) He first gave Lopez instructions regarding Mexicali Chicken business. (*Id.*) He then shifted the conversation, asking Lopez out on a date, telling her he would make her fall in love with him, and telling her Silvestre was no longer his wife. (Doc. No. 1 ¶ 20.a; Doc. No. 9-2 ¶¶ 12–13.) Lopez rejected Salcedo's advance. (Doc. No. 1 ¶ 20.b; Doc. No. 9-2 ¶ 12.) Despite Lopez's rejection, Salcedo persisted, telling her he would make her happy. (Doc. No. 9-2 ¶ 13.) Lopez responded that his advance was inappropriate, that she needed to go, and she ended the call. (*Id.*) During the conversation, Lopez noted that Salcedo was slurring his words and not acting like his usual self. (*Id.* ¶ 14.)

Salcedo called Lopez back shortly after the first call ended. (*Id.* ¶ 15.) He apologized to Lopez. (*Id.*) She asked whether he had been drinking, to which he responded that he had been. (*Id.*) He stated, however, that that was not the reason he had asked her out; rather, he just needed to "get it off his chest." (*Id.*) Salcedo then told Lopez to forget about it, to not think about what he had said to her, and to not take it personally. (*Id.*) The advance left Lopez feeling very uncomfortable with Salcedo. (*Id.* ¶¶ 16, 18–19, 21.)

The day after Salcedo's advance, Lopez complained to a fellow shift supervisor, Erica Solano ("Solano"), about the situation. (Doc. No. 1 ¶ 20.b; Doc. No. 9-2 ¶ 20.) Less

than a week later, Lopez was forced to interact with Salcedo when he came into Mexicali Chicken. (*Id.* ¶ 21.) Salcedo was accompanied by someone who was there for safety-related reasons. (*Id.*) During this interaction, Lopez was noticeably uncomfortable interacting with Salcedo. (*Id.*) Later that day, Salcedo called the restaurant and spoke with Lopez. (*Id.* ¶ 22.) During this conversation, Salcedo informed Lopez that he noticed how uncomfortable she was during the meeting, that she could not act "that way" around him, and that she needed to "respect him." (Doc. No. 1 ¶¶ 20.d, 21.a; Doc. No. 9-2 ¶ 22.)

On or about July 1, 2012, Lopez complained to Silvestre about Salcedo's unwelcome advance. (Doc. No. 1 ¶ 20.c; Doc. No. 9-2 ¶ 23.) Silvestre had called the restaurant to instruct Lopez to call Salcedo and get money ready for him. (Doc. No. 9-2 ¶ 23.) Lopez became distressed at the thought of interacting with Salcedo and explained to Silvestre why she was uncomfortable dealing with Salcedo. (*Id.*) Silvestre responded apologetically and stated she would talk with Salcedo about these events. (*Id.* ¶ 24.)

On or about July 4, 2012, Solano called Lopez as she was getting ready for work. (*Id.* ¶ 25.) Solano informed Lopez that Salcedo told Solano to stay at work the whole day because Lopez was getting fired. (Doc. No. 1 ¶¶ 20.e, 21.b; Doc. No. 9-2 ¶ 25.) Salcedo also instructed Solano to get Lopez's last check ready for when she came in for her shift at Mexicali Chicken. (Doc. No. 9-2 ¶ 25.)

When Lopez got to the restaurant, she attempted to call Salcedo, but he did not answer her calls. (*Id.* ¶ 26.) When Solano called Salcedo, he answered and instructed Solano to give Lopez her last paycheck and to tell Lopez she was fired. (*Id.*) Because Salcedo would not answer Lopez's phone calls, she called Silvestre to discuss her termination. (*Id.* ¶ 28.) Silvestre stated Salcedo could not fire Lopez for "no reason" and "it wasn't right." (*Id.*) However, Salcedo spoke with Solano again to instruct her to "get rid" of Lopez. (*Id.*; *see* Doc. No. 1 ¶ 21.c.) Lopez accordingly left Mexicali Chicken. (Doc. No. 9-2 ¶ 29.)

Lopez filed a charge with the EEOC alleging violations of Title VII by Mexicali Chicken. (Doc. No. 1 ¶ 10.) On April 14, 2014, the EEOC issued to Mexicali Chicken a

3

letter of determination, finding reasonable cause to believe that Title VII had been violated and inviting Mexicali Chicken to join the EEOC in informal methods of conciliation. (*Id.* ¶ 11.) The EEOC was ultimately unable to secure a conciliation agreement acceptable to it. (*Id.* ¶ 13.) Accordingly, the EEOC issued to Mexicali Chicken a notice of failure of conciliation on July 15, 2014, and instituted this lawsuit on September 28, 2015. (*Id.* ¶ 14; *see* Doc. No. 1.)

Mexicali Chicken was personally served with process via its owner and agent for service, Armando Salcedo. (Doc. Nos. 3, 3-1.) Service was effected on November 30, 2015. (Doc. No. 3-1 at 1.) Nonetheless, Mexicali Chicken failed to respond to the complaint; accordingly, the Clerk of Court entered default against Mexicali Chicken on August 26, 2016. (Doc. No. 6.) The EEOC moved for default judgment on September 26, 2016. (Doc. No. 7.) Mexicali Chicken failed to respond to this motion, notwithstanding the Court's invitation to do so. (*See* Doc. No. 10.) This order follows.

### LEGAL STANDARD

Federal Rule of Civil Procedure 55 provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . , the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Here, the EEOC filed a request for entry of default, and default was entered on August 26, 2016. (Doc. Nos. 5, 6.) After default is properly entered, a party seeking relief other than a sum certain must apply to the Court for a default judgment. Fed. R. Civ. P. 55(b). The district court has discretion to enter default judgment. *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

Courts in the Ninth Circuit utilize a seven-factor test to determine whether default judgment is appropriate: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim(s); (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986). Upon default, the factual allegations in the complaint

are taken as true except those related to the amount of damages. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977); *see* Fed. R. Civ. P. 8(b)(6). Allegations of damages must be proven. *See Geddes*, 559 F.2d at 560.

To determine the amount of damages to be awarded, the Court may conduct a damages hearing. Fed. R. Civ. P. 55(b)(2). However, "[w]here damages are liquidated (i.e., capable of ascertainment from definite figures contained in the documentary evidence or detailed affidavits), judgment by default may be entered without a damages hearing." *Microsoft Corp. v. Nop*, 549 F. Supp. 2d 1233, 1235 (E.D. Cal. 2008) (citing *Dundee Cement Co. v. Howard Pipe & Concrete Prods.*, 722 F.2d 1319, 1323 (7th Cir.1983)).

## DISCUSSION

### I. Eitel *Factors*

#### A. Prejudice to the Plaintiff

Under the first factor, the Court must examine whether the EEOC and Lopez will be prejudiced if the Court denies default judgment. *See Eitel*, 782 F.2d at 1471. In light of Mexicali Chicken's failure to answer the complaint, default judgment is the only means by which Lopez may be compensated; thus, denial of the EEOC's request for default judgment will effectively immunize Mexicali Chicken from liability and leave Lopez and the EEOC without redress. *See Amini Innovation Corp. v. KTY Int'l Mtkg.*, 768 F. Supp. 2d 1049, 1054 (C.D. Cal. 2011) (finding prejudice to plaintiff where "a default judgment is the only means available for compensating Plaintiff for Defendants' violations"). Lopez was sexually harassed by one of her superiors and subsequently retaliated against for complaining to another supervisor about the inappropriate advance. Because failure to enter default judgment will prejudice Lopez and the EEOC, this factor weighs strongly in favor of default judgment.

#### B. Merits of the Case and Sufficiency of the Complaint

Under the second and third factors, the Court must examine whether the EEOC has pled facts sufficient to establish and succeed on its claims. *See Eitel*, 782 F.2d at 1471. These factors require the complaint "state a claim on which the [plaintiff] may recover."

*PepsiCo., Inc. v. Cal Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002). In assessing the sufficiency of the complaint, the "well-pled allegations in the complaint regarding liability are deemed true." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

### 1. Sexual Harassment

The EEOC's first cause of action is for quid pro quo sexual harassment in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a). "Title VII of the Civil Rights Act of 1964 forbids an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1053–54 (9th Cir. 2007) (quoting 42 U.S.C. § 2000e-2(a)(1)).

"To prove actionable harassment under a *quid pro quo* or 'tangible employment action' theory, [the plaintiff] must show that [the defendant] 'explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct.'" *Id.* at 1054 (quoting *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994)). A Title VII plaintiff can accomplish this by showing that "submission to or rejection of [unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature] by an individual is used as the basis for employment decisions affecting such individual. . . . ." *Nichols*, 42 F.3d at 511 (quoting 29 C.F.R. § 1604.11(a)(2)), *abrogated on other grounds as recognized in Hudson v. Tahoe Crystal Bay, Inc.*, 191 F.3d 460 (9th Cir. 1999). If the plaintiff satisfies this burden, "the employer is strictly liable for the supervisor's conduct." *Craig*, 496 F.3d at 1054; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762–63 (1998) ("[A] tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate.").

The Court finds the complaint sufficiently alleges a *quid pro quo* sexual harassment claim. Specifically, on or about June 26, 2012, Salcedo called Mexicali Chicken to discuss business. He then shifted the conversation by asking Lopez to date him and telling her he was no longer with his wife and that he would make Lopez fall in love with him. Lopez immediately rejected this unwelcome advance by her decades-older superior. The next day, Lopez complained to Solano, another shift supervisor, about this unwelcome advance. A few days thereafter, but within a week of the unwelcome advance, Lopez complained to Silvestre, another manager and Salcedo's wife. A mere three days after Lopez complained to Silvestre, Salcedo terminated Lopez's employment.

These facts are sufficient to establish a "verbal nexus" given that the unwelcome advance occurred during a conversation about work. *Nichols*, 42 F.3d at 512–13 ("In attempting to determine whether implicit quid pro quo harassment has occurred, the key is often the verbal nexus. That is one way of establishing a violation. The tighter the nexus between a discussion about job benefits and a request for sexual favors, the more likely that there has been an 'implicit' conditioning by the harasser."); *see also Vendermeer v. Douglas Cnty.*, 15 F. Supp. 2d 970, 981–82 (D. Nev. 1998) ("[I]t is clear that implicit quid pro quo sexual harassment is actionable, and that the demand of a physical sexual favor is not necessarily required. It is possible to imagine that a harasser might implicitly condition his victim's continued employment on her continuing, silent acquiescence to his verbal abuse. In other words, when she finally speaks up and objects to his conduct, he fires her."). Furthermore, the fact that Salcedo terminated Lopez one week after the unwelcome advance and three days after Lopez complained to Silvestre underscores the implication that "rejection of [Salcedo's] conduct by [Lopez was] used as the basis for employment decisions affecting [her.]" *Nichols*, 42 F.3d at 511 (quoting 29 C.F.R. § 1604.11(a)(2)); *see also Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1171 (9th Cir. 2003) ("When a supervisor hires or promotes an employee *because* she complies with his sexual demands— or when he fires or passes her over for promotion *because* she refuses to comply—he has abused his authority as the employer's agent and has taken a 'tangible employment

7

action.'"). Taking these allegations as true, the Court finds Plaintiff has sufficiently demonstrated she has established her claim for sexual harassment. Because the Court finds "quid pro quo sexual harassment has been established, [Mexicali Chicken] is, ipso facto, liable." *Nichols*, 42 F.3d at 513.

### 2. Retaliation

The EEOC's second cause of action is for retaliation in violation of § 704 of Title VII, 42 U.S.C. § 2000e-3(a). "Title VII prohibits employers from discriminating against an employee because that employee 'has opposed any practice made an unlawful employment practice by [Title VII], or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (quoting 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there was a causal link between the protected activity and the employer's action. *Pool v. VanRheen*, 297 F.3d 899, 910 (9th Cir. 2002).

Having reviewed the complaint's allegations, the Court finds the EEOC has sufficiently stated a retaliation claim. Lopez engaged in the protected activity of complaining to her manager, Silvestre, about Salcedo's unwelcome sexual advance. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000) ("Passantino's informal complaints to [her supervisor] in 1993 constitute a protected activity, such that actions taken against her after these initial complaints are appropriately the subject of her retaliation claim."); *Davenport v. Bd. of Trs. of State Ctr. Cmty. Coll. Dist.*, 654 F. Supp. 2d 1073, 1087 (E.D. Cal. 2009) ("an employer's retaliatory conduct in response to an employee's complaint of sexual harassment, a protected activity, is actionable under Title VII's antiretaliation provision" (citing *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 965 (9th Cir. 2004))). Lopez was then subjected to an adverse employment action when she was terminated from employment.

Finally, the close proximity between Lopez's complaint to Silvestre and Salcedo terminating Lopez's employment is sufficient, by itself, to establish causation. *See Passantino*, 212 F.3d at 507 ("[C]ausation may be established based on the timing of the relevant actions. Specifically, when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375–76 (9th Cir. 1987))); *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir. 1989) (holding discharges 42 and 59 days after EEOC hearings sufficient to establish prima facie case of causation). Based on the foregoing, the Court finds the EEOC has established its claim for retaliation.

### C. Sum of Money at Stake

Having found the EEOC's causes of action sufficiently pled, the Court examines the amount at stake in relation to the seriousness of Mexicali Chicken's conduct. *See Eitel*, 782 F.2d at 1471. "Default judgment is disfavored where the [sum] of money at stake is too large or unreasonable in light of defendant's actions." *J & J Sports Prods., Inc. v. Betancourt*, No. 08cv937 JLS (POR), 2009 WL 3416431, at *3 (S.D. Cal. Oct. 20, 2009).

Here, the EEOC seeks $53,096 comprised of $3096 in back pay and $50,000 in compensatory and punitive damages. (Doc. No. 9-1 at 22–28.) The EEOC also asks the Court for an award of prejudgment interest on the back pay. (*Id.* at 24.) The EEOC has provided an account of how it arrived at its conservative back pay calculation based on Lopez's detailed recital of her employment history following her termination from Mexicali Chicken. (*Id.*; Doc. No. 9-2 ¶¶ 42–46.) The request for prejudgment interest is readily ascertainable and permitted by statute. 28 U.S.C. § 1961; *see Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 837 (9th Cir. 2012) ("we have acquiesced to the application of the § 1961 rate with respect to pre-judgment interest in Title VII back pay cases"). Meanwhile, the EEOC's request for statutory damages falls within that permitted by Title VII. 42 U.S.C. § 1981a(b)(3)(A). Given that the request for back pay is fairly conservative, and the request for prejudgment interest and compensatory and punitive

damages are authorized by statute, the Court finds this factor weighs in favor of default judgment. *See Sennheiser Elec. Corp. v. Eichler*, No. CV 12-10809 MMM (PLAx), 2013 WL 3811775, at *5 (C.D. Cal. July 19, 2013) ("Since the district court has 'wide discretion in determining the amount of statutory damages to be awarded,' the amount of money requested does not weigh against the entry of default judgment." (quoting *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998))).

### D. Possibility of a Dispute Concerning Material Facts

The fifth *Eitel* factor examines the likelihood of dispute between the parties regarding the material facts of the case. *Eitel*, 782 F.2d at 1471–72. "Where a plaintiff has filed a well-pleaded complaint, the possibility of dispute concerning material facts is remote." *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1082 (C.D. Cal. 2012). As discussed above, the Court finds the EEOC has set forth adequate allegations as to Salcedo's conduct that gave rise to this lawsuit. Lopez has provided a declaration to further support the allegations contained in the complaint. (Doc. No. 9-2.) Moreover, the EEOC has provided a detailed account of its calculation of the back pay owed to Lopez, supported by her employment history following termination from Mexicali Chicken. (Doc. No. 9-1 at 24; Doc. No. 9-2 ¶¶ 42–46.) The request for prejudgment interest and compensatory and punitive damages is explicitly authorized by statute. 28 U.S.C. § 1961; 42 U.S.C. § 1981a(b)(3)(A). Meanwhile, Mexicali Chicken has not responded to the complaint or the EEOC's motions. The Court finds that Mexicali Chicken is unlikely to appear now to contest this matter, and therefore, this factor favors default judgment.

### E. Whether the Default was Due to Excusable Neglect

The sixth *Eitel* factor examines whether the defendant's failure to respond can be attributed to excusable neglect. *See Eitel*, 782 F.2d at 1472. This factor weighs in favor of entry of default judgment where the defendant was properly served. *See Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 922 (C.D. Cal. 2010).

Here, Mexicali Chicken was served pursuant to Federal Rule of Civil Procedure 4(h) on December 18, 2015. (Doc. No. 3.) The EEOC has also provided proof that Mexicali

Chicken was served with the request for entry of default and the instant motion. (Doc. Nos. 5-3, 9-3.)[1] The EEOC has proffered sufficient evidence to show Mexicali Chicken was aware of this litigation. Mexicali Chicken's failure to appear and litigate this matter, therefore, is not likely based on excusable neglect. *See ESET, LLC v. Bradshaw*, No. 10-CV-1369 JLS (JMA), 2011 WL 2680497, at *2 (S.D. Cal. July 8, 2011) ("[W]hen a defendant has been served with notice of the complaint and the application for default judgment, there is effectively no potential that its default was due to excusable neglect."); *Virgin Records Am., Inc. v. Cantos*, No. 06cv915-L(CAB), 2008 WL 2326306, at *3 (S.D. Cal. June 3, 2008) (same). This factor weighs in favor of default judgment.

### VI. Strong Policy Underlying the Federal Rules of Civil Procedure Favoring Decisions on the Merits

The final *Eitel* factor examines whether the strong policy favoring deciding cases on the merits prevents a court from entering default judgment. *Eitel*, 782 F.2d at 1472. Generally, default judgments are disfavored, and a case should be decided on the merits when possible. *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 814 (9th Cir. 1985). However, where a defendant's failure to appear "makes a decision on the merits impracticable, if not impossible," entry of default judgment is warranted. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177. As noted above, Mexicali Chicken's failure to appear or respond in this matter renders a decision on the merits impossible. Accordingly, the Court is not precluded from entering default judgment against Mexicali Chicken.

In sum, the Court finds that all seven *Eitel* factors weigh in favor of default judgment.

## II. Damages

As noted above, the EEOC seeks a total of $53,096 comprised of $3096 in back pay and $50,000 in compensatory and punitive damages. (Doc. No. 9-1 at 22–24.) The EEOC

---

[1] The proof of service concerning the request for entry of default is not signed. (*See* Doc. No. 5-3 at 1.) However, given that the EEOC has provided evidence of proper service of the summons and complaint and the motion for default judgment, the Court does not consider this oversight a barrier to granting the instant motion.

also seeks prejudgment interest on the back pay. (*Id.* at 24.) These remedies do not differ from the relief prayed for in the complaint. (Doc. No. 1 at 6–7.) *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

Having reviewed the EEOC's moving papers and accompanying evidence, the Court concludes that an award of $2592 in back pay is appropriate. At the time of her termination, Lopez was a shift supervisor working an average of 32 hours per week and earning $9 per hour. (Doc. No. 9-2 ¶ 4.) She was unemployed for two months from July 2012 to August 2012. (*Id.* ¶¶ 42–43.) In September 2012, she began working at Wet Seal on a part-time basis, working upwards of 32 hours per week at an hourly rate of $10. (*Id.* ¶ 44.) Shortly after being hired at Wet Seal, she was promoted to assistant manager and worked between 38 and 40 hours per week. (*Id.*) Accordingly, the EEOC seeks back pay only for the approximately 43 workdays that Lopez was unemployed before she began working for Wet Seal. (Doc. No. 9-1 at 24.)

However, the EEOC calculates the amount of back pay based on a 40-hour workweek. By her declaration, Lopez attests she worked an average of 32 hours per week. Accordingly, the Court finds the use of a 32-hour workweek appropriate. Given that there are nine weeks in the months of July and August, the Court finds an award of $2592 in back pay adequate to compensate Lopez.[2]

28 U.S.C. § 1961(a) authorizes the award of prejudgment interest "on any money judgment in a civil case recovered in a district court." *See also United States v. Bell*, 602 F.3d 1074, 1084 (9th Cir. 2010) ("a monetary award does not fully compensate for an injury unless it includes an interest component" (quoting *Kansas v. Colorado*, 533 U.S. 1, 10 (2001))). The interest must be "calculated from the date of the entry of the judgment, at

---

[2] While Lopez received unemployment benefits during this timeframe, (Doc. No. 9-2 ¶ 43), such benefits do not offset the back pay to which she is entitled under Title VII, *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 346–47 (9th Cir. 1982).

a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961(a).

Because an award of prejudgment interest "ensure[s] that [Lopez] is fully compensated for [her] loss," *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995), the Court will award prejudgment interest. The Court finds interest at the rate of 0.88% per annum is appropriate, as this is the average of the one-year treasury constant maturities rate published by the Board of Governors of the Federal Reserve System for December 20 through 26, 2016. *H.15 Selected Interest Rates*, Bd. of Governors of the Fed. Reserve Sys. (Dec. 27, 2016), https://www.federalreserve.gov/releases/h15/. Applying this percentage to the back pay amount of $2592, and accounting for the interest compounding annually, the Court determines prejudgment interest in the amount of $100.32 is appropriate.[3]

The EEOC also asks the Court to award Lopez $50,000 in compensatory and punitive damages. (Doc. No. 9-1 at 25–28; *see* Doc. No. 1 at 6–7.) It argues a maximum statutory damages award is warranted based on Lopez's emotional distress following her treatment at Mexicali Chicken and Mexicali Chicken's failure to have or enforce an antiharassment policy, to respond adequately to Lopez's complaint, and for its flagrant violation of Title VII. (Doc. No. 9-1 at 25–28.)

Compensatory damages may be awarded for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses[.]" 42 U.S.C. § 1981a(b)(3). Punitive damages are permitted where intentional discrimination has been committed. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d

---

[3] This figure is comprised of the following: an award of $22.81 for September 2012 through September 2013; $23.01 for September 2013 through September 2014; $23.21 for September 2014 through September 2015; $23.42 for September 2015 through September 2016; and $7.87 for September 2016 through December 2016.

1020, 1041 (9th Cir. 2003) ("[A]lthough egregious conduct could be evidence of intent to break the law, such conduct [is] not required to establish punitive damages liability. Thus, in general, intentional discrimination is enough to establish punitive damages liability." (quoting *Passantino*, 212 F.3d at 515)).

Having reviewed the EEOC's moving papers and Lopez's declaration, the Court determines an award of $25,000 in compensatory and punitive damages is warranted. The Court recognizes that Mexicali Chicken's conduct, through its managers' actions and inaction, was wrongful and flagrantly violated federal law. Lopez, then a mere 18 years old, understandably experienced stress, anxiety, and reduced self-worth. (Doc. No. 9-2 ¶¶ 33–34, 36, 40.) Fortunately, however, the events that transpired did not result in the need for medical care or psychological counseling. Lopez was out of work for only two months, and she appears to have rebounded from this experience with aplomb, a feat which the Court applauds. In light of the foregoing, the Court finds a statutory damages award of $25,000 adequately compensates Lopez for her emotional distress and punishes Mexicali Chicken for its flagrant violation of federal law.

### CONCLUSION

Based on the foregoing, the Court **GRANTS** the EEOC's motion for default judgment. (Doc. No. 9.) The Court awards damages of $27,692.32 comprised of $2592 in back pay, $100.32 in prejudgment interest, and $25,000 in compensatory and punitive damages to Plaintiff. The Clerk of Court is directed to enter judgment for Plaintiff and against Defendant consitant with this order.

**IT IS SO ORDERED.**

Dated: December 28, 2016

*[signature]*

Hon. Anthony J. Battaglia
United States District Judge